# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WRIGHT FOODS GROUP, LLC, | )<br>)<br>) |
| Plaintiff, | )<br>) Civil Action No. |
| v. | )<br>) **JURY TRIAL DEMANDED** |
| ASEPTIA, INC., | )<br>) |
| Defendant. | )<br>) |

## COMPLAINT

Plaintiff Wright Foods Group, LLC ("WFG" or "Buyer" or "Plaintiff"), by its undersigned attorneys, as and for its Complaint against defendant Aseptia, Inc. ("Aseptia" or "Seller" or "Defendant"), alleges as follows:

## NATURE OF ACTION

1. Plaintiff brings this action against Aseptia for common law fraud and breach of contract in connection with Plaintiff's purchase of certain properties and assets of Wright Foods, Inc. and Carolina Dairy, LLC, two companies owned by Aseptia (together with Aseptia, the "Seller Parties"), pursuant to an Asset Purchase Agreement, dated February 7, 2016 (the "APA"). As a result of Aseptia's willful misconduct, including multiple misrepresentations and omissions of material facts regarding the Seller Parties' finances as of the time of the Closing, Plaintiff has been defrauded and has suffered damages in excess of $15,000,000.

## PARTIES, JURISDICTION AND VENUE

2. Plaintiff Wright Foods Group, LLC is a Delaware limited liability corporation with its principal place of business located at 18200 Highway 41 North, Evansville, Indiana 47725.

3. Defendant Aseptia is a North Carolina corporation, with its principal place of business located at 723 West Johnson Street, Raleigh, North Carolina 27603.

4. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). The parties in this matter are citizens of the states of Delaware and North Carolina, respectively, and the amount in controversy is greater than $75,000.

5. This Court has personal jurisdiction over Aseptia by virtue of the express terms of the APA. Specifically, the APA provides that "[e]ach party hereto agrees that any action or proceeding based upon or relating to this Agreement will . . . be brought and maintained exclusively in the courts of the State of Delaware or in the United States District Court located in Wilmington, Delaware." APA, § 14.5. The APA further provides that: "[e]ach party hereto irrevocably submits to the jurisdiction of the courts of the State of Delaware and of the United States District Court located in Wilmington, Delaware for purposes of any such action or proceeding . . . ." *Id.*

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS

### THE ASSET PURCHASE AGREEMENT

7. Plaintiff is a wholly-owned subsidiary of AmeriQual Group Holdings LLC ("AmeriQual"), a Delaware limited liability company which specializes in the production, packaging, assembly and distribution of high-quality, shelf-stable food products to the United States Department of Defense and major branded food companies.

4822-6277-8957\12

8. Upon information and belief, Aseptia is a food technology company, founded in 2006, and specializing in aseptic and related technologies.

9. Upon information and belief, Aseptia was formed to commercialize a novel food-processing technology developed by a consortium led by North Carolina State University.

10. Upon information and belief, from approximately 2014 through 2016, a wholly-owned subsidiary of Aseptia, Carolina Dairy, LLC ("Carolina Dairy"), was in the yogurt-processing business and manufactured Danimals pouches (yogurt products) for The Dannon Company, Inc. ("Dannon") pursuant to a Master Co-Pack Supply Agreement between Dannon and Carolina Dairy, dated February 21, 2014, as amended, and including Pouch Product Schedule 2015 (collectively, the "Supply Agreement").

11. In or around 2015, seeking to expand on its own food-processing business and to further develop technology in the food-preservation area, AmeriQual entered into negotiations with Aseptia regarding the sale of Aseptia's aseptic food and yogurt processing businesses. Aseptia had groups of its assets available for sale through an offering process led by Fidus Partners, a specialty financial advisory firm located in North Carolina commencing on or around May 2015. AmeriQual had a significant share of the low-acid infant feeding products market, and it believed that Aseptia's processing and validation technologies would further entrench its market position for these products. Furthermore, AmeriQual had been assessing aseptic processing and packaging technologies more broadly and felt that the operating assets of Aseptia – namely, Wright Foods, Inc. – may provide an effective entry to this capability and related end markets. Aseptia's other operating entity, Carolina Dairy, was believed to provide cash flows sufficient for AmeriQual to consider an investment in these assets.

4822-6277-8957\12

12. Plaintiff reviewed various documents and information provided by Aseptia from November 2015 through February 2016 in connection with the proposed transaction.

13. Specifically, in or about late December 2015, or early January 2016, Aseptia and/or its representatives provided a Financial Report which included Income Statements for Carolina Dairy noting an EBITDA of $3,545,882 for the eleven-month period prior to November 30, 2015, as well as many other documents detailing the purported financial condition of Wright Foods, Inc. and Carolina Dairy. The purchase price paid for the assets was based on a multiple of EBITDA, as well as other factors.

14. Based on Aseptia's representations concerning the financial condition, operating results, income, revenue and expenses of Wright Foods, Inc. and Carolina Dairy, Plaintiff was formed as an acquisition entity and was induced to enter into the APA with Aseptia, Wright Foods, Inc., and Carolina Dairy. A true and correct copy of the APA is attached hereto as Exhibit A.

15. The sale of assets under the APA closed on February 29, 2016 (the "Closing Date").

16. Pursuant to the APA, Plaintiff acquired substantially all of the tangible and intangible properties and assets that constituted Aseptia's and Wright Foods, Inc.'s aseptic food-processing business, product line and other ancillary items, Carolina Dairy's yogurt-processing business, and sublicenses of Aseptia's processing and validation technology pertaining to certain package types and food product categories(collectively, the "Business").

## ASCEPTIA'S REPRESENTATIONS AND WARRANTIES UNDER THE ASSET PURCHASE AGREEMENT

17. In the APA, Aseptia made specific representations and warranties regarding the Business. *See* APA, § 5.

4

18. In the APA, Aseptia represented to Plaintiff that, since the close of business on November 30, 2015, "there has been no material adverse change in the Condition of the Business, and each of Seller or [Carolina Dairy] has no Knowledge of any such change which is threatened; and there has not been any material damage, destruction or loss to any of the properties or assets of the Business since such date." APA, § 5.4.

19. Aseptia also represented to Plaintiff that the Income Statements attached to the APA "were prepared in accordance with the books and records of Seller and [Carolina Dairy] and with GAAP, and (ii) fairly present the results of operations for the periods set forth therein." APA, § 5.16.

20. In the APA, Aseptia further represented to Plaintiff that the "Accounts Receivable of each of Seller and [Carolina Dairy] conveyed to [Plaintiff] in the Assets represent sales actually made in the ordinary course of business, are not subject to any defense or offset, and are current." APA, § 5.20(c).

21. Aseptia also represented to Plaintiff that it, and Carolina Dairy, "maintain their respective books, records and accounts (including, but not limited to, those kept for financial reporting and Tax purposes) in accordance with good business practices and in sufficient detail to reflect accurately and fairly the transactions and the Condition of the Business in all material respects." *See* APA, § 5.26.

22. In the APA, under the heading "Disclosure," Aseptia also represented to Plaintiff that "[n]one of (i) the representations or warranties of Seller and [Carolina Dairy] contained herein, [and/or] (ii) the information contained in the Schedules referred to in this Article V . . . is or will be false or misleading in any material respect or omits or will omit to state a fact herein

5

or therein required to be stated or necessary to make the statements herein or therein, in light of the circumstances under which made, not misleading in any material respect." *See* APA, § 5.41.

## ASEPTIA'S OMISSIONS AND MISREPRESENTATIONS

23. On February 29, 2016, Aseptia, Carolina Dairy, Plaintiff, AmeriQual and Dannon entered into an Assignment and Assumption agreement which became effective on the Closing Date (the "Assignment").

24. The Assignment provided that Carolina Dairy remained "at all times solely responsible for all duties, liabilities and obligations arising under the Supply Agreement that arose prior to the Effective Date, including any claims made after the Effective Date based on facts arising prior to the Effective Date." After the Effective Date of the Assignment, Carolina Dairy further agreed that it shall "retain all liabilities under the Supply Agreement that arose prior to the Effective Date, and Aseptia agrees to be jointly and severally liable" with Carolina Dairy "for all such liabilities." Plaintiff agreed to assume "all of the duties, liabilities, obligations of [Carolina Dairy] under the Supply Agreement that arose on or after the Effective Date."

25. During June 2016, several months after the Closing of the APA, representatives of Dannon contacted WFG and informed it that Dannon had discovered a significant pricing discrepancy with respect to the packaging costs it was being charged on a pass-through basis, from 2014 through 2016 for Carolina Dairy to manufacture Dannon's Danimals pouches (yogurt products).

26. This was the first time that Plaintiff became aware of any discrepancy with regard to the pricing Dannon had been charged for such packaging.

27. Thereafter, on or about February 8, 2017, three employees of WFG, each of whom had been an employee of Aseptia and/or Carolina Dairy prior to the Closing, reported to Joe Penshorn ("Penshorn"), the President of WFG, that, prior to the Closing, they had been aware of the significant pricing discrepancy with respect to the packaging costs Dannon was being charged for Carolina Dairy to manufacture Dannon's Danimals pouches.

28. The three employees – John Winnie ("Winnie"), Vice-President of Operations at Carolina Dairy; Kenna Kirkland ("Kirkland"), then Controller of Aseptia; and Edward Sanchez ("Sanchez"), then Operations Manager for Carolina Dairy – reported to Penshorn that, in early November 2015, they had become aware that Carolina Dairy was improperly charging Dannon for glue and other items used in product packaging. The prices Carolina Dairy charged Dannon for its services and packaging were pursuant to a formula that, among other factors, passed through the actual cost to Dannon of certain basic materials and elements of the packaging products. Glue was one of those elements. Winnie had discovered that Dannon was mistakenly being charged more than 46 times the amount that it should have been charged for glue based on an erroneous calculation of the weight of the glue used. He confirmed this by consulting Sanchez, who agreed that the glue weight charges were erroneous.

29. After Winnie discovered and confirmed the error, he promptly reported it to Aseptia's Chief Executive Officer, David Clark ("Clark"), who then directed him to work with Kirkland to perform an analysis of the estimated liability that Aseptia/Carolina Dairy had to Dannon as a result of the error.

30. Kirkland thereafter prepared a written spreadsheet analysis, which she emailed to Winnie and Clark on November 16, 2015. That same day, Clark emailed A.L. McAulay III

("McAulay"), then Executive Vice-President and Chief Financial Officer of Aseptia and Carolina Dairy, to apprise him of the extent of the overcharging to Dannon.

31. After Clark received the spreadsheet, he contacted Winnie, in late November or early December 2015, and instructed him not to tell anyone about the glue-pricing error, that too much money was at stake, and that revealing the error to Dannon or anyone else would have an overly negative impact on the business. Clark simultaneously directed Winnie to tell Kirkland that she must not tell anyone about the glue-pricing error. Winnie told Kirkland what Clark had said to him. Kirkland and Winnie discussed that this was not the right thing to do; but, based on their assessment of Clark, they were almost certain they would be fired if they revealed the error to Dannon.

32. In January 2016, during the period prior to the sale of assets to Plaintiff, John Gregg ("Gregg"), an attorney for Aseptia, made an oral presentation to key employees (including Winnie) of Aseptia and its affiliates regarding their responsibilities in cooperating in the due diligence process being conducted by Plaintiff and its counsel. Gregg stated that Aseptia was obligated to disclose "everything" that may be relevant to the transaction. Shortly after the presentation by Gregg, Winnie was contacted by Clark, who told him that, despite what he had heard from Gregg, he was not to tell anyone at WFG or WFG's representatives anything about the glue-pricing error or anything related thereto. He further instructed Winnie to contact Kirkland and again instruct her not to tell anyone about the glue-pricing errors. Clark emphasized that, if Winnie or any other employee were to disclose these errors, it would interfere with the sale of the assets and "the whole thing will fall apart."

33. Following that conversation with Clark, Winnie again told Kirkland that Clark had instructed Winnie to tell her to remain silent on the glue-pricing errors and related issues.

34. Prior to the Closing Date, no employees of Aseptia or its affiliates revealed any of the facts concerning the glue-pricing errors, either to Dannon or to Plaintiff and its representatives.

35. Based on the foregoing, Aseptia and its representatives, including Clark and McAulay, knew as early as November 2015 of the glue-pricing errors and, at all times thereafter until the Closing Date, knew that the Income Statements provided to Plaintiff (and attached to the APA) were false and the revenues and profits of the Business were overstated.

36. Following its original discovery of the pricing discrepancy in or about June 2016, Dannon conducted a detailed review of the circumstances relating thereto. By December 2016, Dannon discovered that Carolina Dairy had overcharged Dannon a total of $3,312,399 between October 13, 2014 and September 30, 2016, amounting to an average of $0.2034 per pound over a two-year period.

37. In or around October 2016, at the conclusion of its own internal investigation of Carolina Dairy's pricing of Dannon materials, Plaintiff determined that Dannon's calculations on the historical pricing overcharge were accurate.

38. Pursuant to its obligations under the Assignment, Plaintiff agreed to settle with Dannon for the pricing overcharge that post-dated the Effective Date of the Assignment, specifically agreeing to pay the pricing overcharge covering the time-period from March 2016 through the end of September 2016, plus interest at the rate of 7.5% per annum assessed by Dannon.

39. However, pursuant to the Assignment, Aseptia remains jointly and severally liable for the pricing overcharge that pre-dated the Effective Date of the Assignment, which covers the

time-period from October 2014 through February 2016 and amounts to $1,714,145, including 7.5% interest assessed by Dannon.

40. As a direct result of Aseptia's misrepresentations and omissions, including knowingly and deliberately failing to disclose to Plaintiff prior to the Closing that the income and profits provided in the Seller Parties' Income Statements (as defined in the APA) were inflated due to overcharging of products manufactured for Dannon, the financial statements and other information upon which Plaintiff relied were false and misleading, and significantly overstated the Seller Parties' business and revenues. Because Aseptia overstated Carolina Dairy's business and revenues, Plaintiff paid Aseptia significantly more than it would otherwise have been willing to pay for the assets purchased under the APA, especially inasmuch as the purchase price was based, at least in part, on a multiple of EBITDA, which was itself falsely inflated.

## COUNT I

### CLAIM FOR FRAUD

41. Plaintiff incorporates by reference all of the preceding Paragraphs as if fully stated herein.

42. In conjunction with the sale of assets of Wright Foods, Inc. and Carolina Dairy, Aseptia and its representatives made certain representations to Plaintiff regarding the business, financial condition, operating results, income and expenses of Carolina Dairy, among other things. The representations Aseptia and its representatives made to Plaintiff regarding the financial condition, operating results, income and expenses of the Business were false when made.

43. Aseptia and its representatives knew that improper business practices were being employed at Carolina Dairy prior to the Closing, including overcharging for products being manufactured for one of Carolina Dairy's largest customers, Dannon, and that the result of those business practices was to inflate the revenue and profit on Carolina Dairy's financial statements.

44. Aseptia and its representatives knowingly, willfully and intentionally concealed from Plaintiff the fact that Carolina Dairy was overcharging Dannon for products, and knowingly, willfully and deliberately supplied Plaintiff with false and misleading information regarding the business, financial condition, operating results, income and expenses of Carolina Dairy, intending to induce Plaintiff to buy the assets of Carolina Dairy and to pay an artificially inflated purchase price for the Business.

45. Aseptia and its representatives intentionally made false statements to Plaintiff during the due diligence period relating to the transaction and in the representations, warranties and covenants contained in the APA in order to induce Plaintiff to purchase the assets at an improperly inflated price.

46. Aseptia, as Seller, had a duty to disclose to Plaintiff that the representations made to Plaintiff regarding the financial condition, operating results, income and expenses of Carolina's business were false.

47. The foregoing omissions and misrepresentations were material.

48. Plaintiff's reliance upon Aseptia's false representations, omissions and concealments in connection with its purchase of assets under the APA, was reasonable, as Plaintiff was unaware of the falsity of these representations and was also unaware of the material omissions prior to the Closing.

4822-6277-8957\12

49. Had Plaintiff known that the above representations of Aseptia and its representatives were materially false or that material facts regarding Carolina Dairy's business were omitted and concealed by Aseptia and its representatives, Plaintiff would not have purchased the Business for the consideration stated in the APA.

50. Aseptia's misrepresentations and omissions were the direct and proximate cause of damages to Plaintiff.

51. As a result of the fraud of Aseptia and its representatives, Plaintiff has suffered harm and loss of at least $15,000,000, exclusive of interest.

## COUNT II

## BREACH OF CONTRACT

52. Plaintiff incorporates by reference all of the preceding Paragraphs as if fully stated herein.

53. The APA is a binding and enforceable contract between Plaintiff and Aseptia.

54. In Section 5.4 of the APA, Aseptia represented to Plaintiff that, since the close of business on November 30, 2015, "there has been no material adverse change in the Condition of the Business, and each of Seller or [Carolina Dairy] has no Knowledge of any such change which is threatened; and there has not been any material damage, destruction or loss to any of the properties or assets of the Business since such date."

55. In Section 5.16 of the APA, Aseptia also represented to Plaintiff that the Income Statements attached to the APA "were prepared in accordance with the books and records of Seller and [Carolina Dairy] and with GAAP, and (ii) fairly present the results of operations for the periods set forth therein."

56. In Section 5.20(c) of the APA, Aseptia further represented to Plaintiff that the "Accounts Receivable of each of Seller and [Carolina Dairy] conveyed to [Plaintiff] in the Assets represent sales actually made in the ordinary course of business, are not subject to any defense or offset, and are current."

57. In Section 5.26 of the APA, Aseptia represented to Plaintiff that it, and Carolina Dairy, "maintain their respective books, records and accounts (including, but not limited to, those kept for financial reporting and Tax purposes) in accordance with good business practices and in sufficient detail to reflect accurately and fairly the transactions and the Condition of the Business in all material respects."

58. In Section 5.41 of the APA, under the heading "Disclosure," Aseptia also represented to Plaintiff that "[n]one of (i) the representations or warranties of Seller and [Carolina Dairy] contained herein, [and/or] (ii) the information contained in the Schedules referred to in this Article V . . . is or will be false or misleading in any material respect or omits or will omit to state a fact herein or therein required to be stated or necessary to make the statements herein or therein, in light of the circumstances under which made, not misleading in any material respect."

59. By manipulating and concealing the true financial condition, operating results, income, revenue and expenses of the Business prior to and through the date of the Closing, including knowingly failing to disclose to Plaintiff prior to the Closing that the income, profits and revenue provided in the Seller Parties' Income Statements (as defined in the APA) were inflated due to overcharging of products manufactured for Dannon, the financial statements and other information upon which Plaintiff relied were false and misleading, and significantly

13

overstated the Seller Parties' business and revenues, Aseptia breached Sections 5.4, 5.16, 5.20(c), 5.26 and 5.41 of the APA.

60. Upon discovery of Aseptia's breaches, Plaintiff provided timely written notice to Aseptia of its claims under the APA.

61. Plaintiff has complied in all material respects with its obligations under the APA.

62. Aseptia's breaches of contract were the product of its willful misconduct. As a direct and proximate result of Aseptia's breaches of the APA, Plaintiff paid Aseptia substantially more than it would otherwise have been willing to pay for the assets purchased under the APA, especially inasmuch as the purchase price was based, among other factors, on a multiple of EBITDA, which was itself falsely inflated.

63. As a direct and proximate result of Aseptia's breaches of the APA, Plaintiff has been damaged in an amount of at least $15,000,000, exclusive of interest.

WHEREFORE, Plaintiff prays for a judgment:

(a) Awarding Plaintiff compensatory damages incurred as a consequence of Aseptia's fraud in the amount of at least $15,000,000, the precise amount to be proven at trial, plus interest;

(b) Awarding Plaintiff punitive damages on its claim for fraud;

(c) Awarding Plaintiff $15,000,000 on its claim for breach of contract, plus interest;

(d) Awarding Plaintiff its reasonable attorneys' fees, pursuant to APA § 12.1, incurred as a result of Aseptia's fraud, willful misconduct and breaches of contract; and

(e) Awarding Plaintiff such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and defenses so triable.

Dated:  September 20, 2017          DORSEY & WHITNEY (DELAWARE) LLP

                                                    /s/ Eric Lopez Schnabel
Eric Lopez Schnabel (DE Bar No. 3672)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
          glorioso.alessandra@dorsey.com

-and-

Jonathan M. Herman (*pro hac vice pending*)
Elizabeth Baksh (*pro hac vice pending*)
Kaleb McNeely (*pro hac vice pending*)
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  herman.jonathan@dorsey.com
          baksh.elizabeth@dorsey.com
          mcneely.kaleb@dorsey.com

***Attorneys for Plaintiff Wright Foods Group, LLC***